United States District Court
Southern District of Texas
**ENTERED**
August 12, 2016
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JASON BALTASAR FRANCO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-15-2443 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 9) and Defendant's Cross Motion for Summary Judgment (Doc. 10). The court has considered the motions, the administrative record, and the applicable law. For reasons set forth below, the court **RECOMMENDS** that Plaintiff's Motion be **GRANTED**, that Defendant's motion be **DENIED**, and that this matter be **REMANDED** to the Commissioner for further consideration of Plaintiff's medical evidence in conformity with this opinion.

### I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claim for

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 8.

disability insurance benefits under Title II of the Social Security Act ("The Act").

## A. Procedural History

Plaintiff first applied for Social Security benefits on September 13, 2007.[2] Defendant determined that Plaintiff's medical records showed his condition became disabling with the onset of throat cancer on August 1, 2005, but, that by February 17, 2007, when the medical records showed no recurrent disease and physical improvement, Plaintiff was no longer disabled.[3] On November 8, 2007, Defendant determined that Plaintiff was disabled during a closed period of time between August 1, 2005, and February 17, 2007, and awarded him benefits under Title II.[4] However, Defendant denied Plaintiff's supplemental security income ("SSI") under Title XVI for the closed period.[5]

Plaintiff then submitted a request for reconsideration, dated March 12, 2008, asking for a review of his eligibility to receive social security benefits post-February 17, 2007, as Plaintiff believed himself disabled.[6] Reconsideration was denied, and, on August 25, 2008, Plaintiff completed a request

---

[2]    See Tr. of the Admin. Proceedings ("Tr.") 139.

[3]    See Tr. 100.

[4]    See Tr. 78, 107-09.

[5]    See Tr. 101.

[6]    See Tr. 110-11.

for hearing.[7]   This request was not timely filed,[8] but the Commissioner granted Plaintiff an out-of-time appeal.[9]

Plaintiff's first administrative hearing with Administrative Law Judge ("ALJ") Gary Suttles was held on February 19, 2009, in Houston, Texas.[10]  At this hearing, the ALJ determined the period under consideration for whether Plaintiff was disabled was from February 18, 2007, onward.[11]  On March 17, 2009, the ALJ issued an unfavorable decision, finding that Plaintiff had not been disabled from February 18, 2007, to the date of the ALJ's decision.[12]

Following this unfavorable decision, Plaintiff reapplied for benefits under Title II in September 2009, and then under Title XVI in October 2009.[13]  Defendant subsequently denied Plaintiff's application for SSI benefits via letter dated October 30, 2009 due to his disability payments through the Veteran's Administration ("VA"), as his income was too high to qualify.[14] Then, in April 2010, a state agency doctor determined Plaintiff

---

[7]      See Tr. 112-13.

[8]      See id.

[9]      See Tr. 928.

[10]     See Tr. 83.

[11]     See id.

[12]     See Tr. 80, 94.

[13]     See Tr. 144, 167.

[14]     See 170-171, 168.

was disabled and that his conditions met medical Listing 12.04 (the "Listings")[15] for affective/mood disorders with a disability onset date of March 18, 2009, the day following the unfavorable decision from Plaintiff's initial ALJ hearing.[16]

Following these events, Plaintiff's case history was reviewed by the Appeals Council, who decided to: (1) vacate both the ALJ's unfavorable March 2009 decision and the April 2010 determination; (2) consolidate the claims; and (3) send them to an ALJ for further review and determination.[17]  Following the Appeals Council decision in February, 2011, Plaintiff received a notice of a second ALJ hearing on July 30, 2014.[18]

**B.  Medical History**

Plaintiff was diagnosed with tonsillar cancer in the fall of 2005, marking the beginning of his medical problems.[19]  The treatment for this was a tonsillectomy followed by radiation.[20] The radiation therapy ended in November 2005.[21] However, as a result of the cancer and subsequent treatment, Plaintiff suffered

---

[15]   See Tr. 79.  The Listings are found at 20 C.F.R. Pt. 404, Subpt. P, App. 1.  20 C.F.R. §§ 416.920(d), 416.925, 416.926.

[16]   See Tr. 79-80.

[17]   See Tr. 116-120.

[18]   See Tr. 116, 126.

[19]   See Tr. 393.

[20]   See Tr. 354.

[21]   See id.

from xerostomia and fatigue.[22]   Plaintiff reported he was monitored for depression at this time.[23]

In August, 2007, Plaintiff began undergoing psychiatric treatment through the VA in Houston.[24]   Plaintiff first saw Danielle Morris, an LVN, who administered several screening tests including a pre-screen for major depression, which scored positive.[25]   Other screening tests included those for post-traumatic stress disorder ("PTSD"), alcohol abuse, traumatic brain injury, wellness guide and fall scale, and a general medical screen.[26]   Plaintiff reported fatigue, headaches, muscle/joint pain and forgetfulness as other symptoms that had lasted longer than three months and interfered with his activities of daily living.[27]   Plaintiff visited Psychologist Helen Beckner, Ph.D., ("Dr. Beckner") who diagnosed him with Recurrent Depressive Disorder and a current global assessment of function ("GAF") score of 51.[28]   In her psychiatric review, Dr. Beckner noted Plaintiff's depressive symptoms:

---

[22]   See id.  Xerostomia is dryness of the mouth "caused by cessation of normal salivary secretion" and may "result from radiation treatments for cancers of the face, head, or neck."  Mosby's Pocket Dict. of Med., Nursing & Allied Health 1906 (9th ed. 2013).

[23]   See Tr. 366.

[24]   See Tr. 759.

[25]   See Id.

[26]   See Tr. 759-61.

[27]   See Tr. 760.

[28]   See Tr. 758.

Depressed mood, decreased interest in pleasurable
activities, difficulty in staying asleep, excessive
guilt, feelings of worthlessness, fatigue or loss of
energy, indecisiveness, diminished ability to
concentrate, variable appetite, recurrent thoughts of
death, passive suicidal ideations, decreased libido,
low self-esteem, frequent crying spells, feeling overly
emotional, irritability, feelings of hopelessness and
helplessness, isolation and social withdrawal.[29]

On August 30, 2007, Plaintiff saw David Graham, M.D., ("Dr.
Graham"), for his psychological evaluation session.[30]  Dr. Graham
acted as Plaintiff's treating psychiatrist for the next several
years for mental health issues.[31]  Dr. Graham noted that
mentally, Plaintiff's major issue was depression with its origin
being his medical discharge from the Air National Guard, where he
felt "very betrayed" and "lied to."[32]  Dr. Graham's mental status
examination reported that Plaintiff had episodic passive suicidal
ideation and a blunted affect.[33]  Dr. Graham prescribed
Citalopram for depression and Trazodone for insomnia.[34]

At the end of October 2007, Plaintiff again saw Dr.
Graham.[35]  Plaintiff reported he had begun a job in car sales but
had to quit after a week because the long shifts posed

---

[29]    Tr. 753.

[30]    See Tr. 741-45.

[31]    See Tr. 439.

[32]    See Tr. 741.

[33]    See Tr. 743.

[34]    See Tr. 744.

[35]    See Tr. 728.

problems.[36]   Otherwise,   Dr.   Graham   noted   that   Plaintiff   reported

he   was   "doing   alright"[37]   and   assigned   a   GAF   score   of   58.[38]   His

mental   status   examination   was   largely   the   same   as   the   previous

appointment.[39]

Plaintiff's   next   visits   with   Dr.   Graham   in   February,   April

and   June   of   2008   reflected   that   his   GAF   score   remain   relatively

consistent   at   58,   58,   and   60.[40]   While   his   GAF   scores   remained

stable   during   these   visits,   Plaintiff   reported   to   Dr.   Graham   that

his   anger   was   worsening.[41]   Dr.   Graham   noted   in   April   that   "rage,

anger   and   poor   sleep"   were   Plaintiff's   major   mental   health

issues.[42]     Accordingly,   Dr.   Graham   adjusted   Plaintiff's

medications   in   order   to   treat   Plaintiff's   depression,   insomnia

and   anger,   and   prescribed   quetiapine.[43]   In   June   2008,   Plaintiff

again   scored   positive   on   a   PTSD   screening.[44]

For   the   remainder   of   2008,   Plaintiff's   mental   health

stability   decreased;   Dr.   Graham   rated   his   GAF   score   at   a   50,   51,

---

[36]     See Tr. 728.

[37]     See id.

[38]     See Tr. 732.

[39]     See Tr. 732.

[40]     See Tr. 664, 671, 698, 701, 707, 711. 707.

[41]     See Tr. 698.

[42]     See Tr. 701.

[43]     See Tr. 667.

[44]     See Tr. 670.

and 52 during Plaintiff's final three visits of 2008.[45]    Dr. Graham also noted Plaintiff was at his "baseline."[46]

During this time, Plaintiff reported to Dr. Graham that his lawyer advised him to get a Minnesota Multiphasic Personality Inventory ("MMPI") to assist with his disability claim.[47]    Dr. Graham noted that he would refer Plaintiff to a psychologist to get an MMPI, "particularly regarding his aggression and outbursts."[48]    Plaintiff again had a positive PTSD screening score,[49]   and Dr. Green determined that Plaintiff needed treatment.[50]

On October 24, 2008, Plaintiff was evaluated by Dr. Robert G. Harper, Ph.D., ("Dr. Harper") at the Menninger Department of Psychiatry and Behavioral Sciences at Baylor College of Medicine.[51]    Dr. Harper conducted a clinical interview of Plaintiff and administered multiple tests including the MMPI.[52] Dr. Harper made three diagnosis: (1) a Major Depressive Disorder-Severe without psychotic features; (2) a pain disorder with

---

[45]    See Tr. 592, 617, 634.

[46]    See Tr. 632, 617, 592.

[47]    See Tr. 614.

[48]    See id.

[49]    See Tr. 641.

[50]    See Tr. 634.

[51]    See Tr. 427.

[52]    See id.

physiological and psychological features; and (3) a cognitive disorder, not otherwise specified.[53]

Dr. Harper also noted that Plaintiff's profile "suggests the presence of characterological issues that are likely to make change very difficult."[54]   Dr. Harper further reported that Plaintiff had difficulty controlling and expressing his anger appropriately and his feelings of rejection led to hostility and conflict, which further exacerbated his feelings of isolation.[55] Dr. Harper found that Plaintiff's test results were consistent with a history of depression.[56]   The results of the MMPI showed that Plaintiff may be "subjectively exaggerating symptoms of pathology," because his validity scales, which reflected levels of distress and alienation, were clinically elevated.[57]   However, Dr. Harper concluded that this was a result of Plaintiff's emotional decompensation.[58]   Dr. Harper took these result into account when reporting his findings and diagnoses.[59]

---

[53]   See id.

[54]   See Tr. 429.

[55]   See id.

[56]   See id.

[57]   See id.

[58]   See id.

[59]   See Tr. 427-30.

In 2009, Plaintiff had four face-to-face appointments with Dr. Graham.[60] During this year, Dr. Graham never rated Plaintiff's GAF above 54, he was consistently at either 52 or 54.[61] At one appointment, Plaintiff reported he had not been compliant with taking quetiapine for a month but agreed to restart the medication.[62]

During 2009, Plaintiff again tested positive on a PTSD screening test[63] and was diagnosed with sleep and anger issues.[64] During one session, Plaintiff reported "getting physical" with his wife.[65] Dr. Graham's mental status examination continued to report passive suicidal ideation and blunted affect.[66]

At Plaintiff's March 2010 appointment, Dr. Graham noted that Plaintiff voiced anger towards his daughter's stepfather for committing suicide, after it was discovered he had been abusing Plaintiff's daughter.[67] Plaintiff stated to Dr. Graham that he "[felt] stuff around him" and used a metaphor of evil spirits

---

[60]     See Tr. 522, 532, 538, 559.

[61]     See Tr. 524, 530, 535, 541, 560.

[62]     See Tr. 538-39.

[63]     See Tr. 544.

[64]     See Tr. 532, 538-39, 552-53.

[65]     See Tr. 532, 538-39.

[66]     See Tr. 524, 529, 534, 541, 559.

[67]     See Tr. 454, 889.

when describing this feeling.[68]   Despite this development, Dr. Graham recorded Plaintiff's GAF at 60.[69]

At a follow-up appointment on March 29, 2010, Plaintiff stated his anger had not improved.[70]  Dr. Graham reported that Plaintiff had a desire to isolate along with feeling "on edge" and expressing anxiety.[71]  Dr. Graham discussed treatment options after Plaintiff admitted to not taking his medication every day.[72]  At this appointment, Plaintiff again received a positive score on a PTSD screening.[73]  Dr. Graham rated Plaintiff's GAF at 58.[74]

In May 2010, Plaintiff received a negative score on a four-question PTSD screening.[75]   In August and November, Dr. Graham reported that Plaintiff had experienced PTSD-type paranoid thoughts, along with ongoing anger and irritability directed towards his extended family.[76]

---

[68]      See Tr. 889.

[69]      See Tr. 892.

[70]      See Tr. 882.

[71]      See id.

[72]      See id.

[73]      See Tr. 887.

[74]      See Tr. 885.

[75]      See Tr. 880.

[76]      See Tr. 862, 867.

Plaintiff's last appointment with Dr. Graham was on February 1, 2011.[77]   At this appointment, Dr. Graham recorded that Plaintiff was having emotional issues due to living with his in-laws since the previous May and experienced ongoing issues with the SSA.[78]  Dr. Graham again noted PTSD-type paranoid thoughts.[79] Dr. Graham rated Plaintiff's GAF score as 49 and increased his venlafaxine prescription.[80]

In May, 2011, Plaintiff spoke to Lisa Miller, Pharm. D., ("Dr. Miller") for a mental health medication management note.[81] At this time, Plaintiff reported compliance with his medications and they discussed increasing his venlafaxine; however, Plaintiff decided to maintain the current dose.[82]  Additionally, Dr. Miller noted that Plaintiff reported continuing anger and stated that he would hit a car or wall in his anger.[83]

On August 5, 2011, Plaintiff saw Dr. Erica Montgomery, M.D., ("Dr. Montgomery") who was filling in for Dr. Graham at the VA.[84] Dr. Montgomery stated that Plaintiff continued to have anger

---

[77]    See Tr. 826, 838, 842, 853.

[78]    See Tr. 857, 853.

[79]    See Tr. 855.

[80]    See Tr. 856.

[81]    See Tr. 842.

[82]    See id.

[83]    See id.

[84]    See Tr. 838-41.

issues, reported hitting objects, and was confrontational during the visit.[85]   Regarding medications, Dr. Montgomery noted that Plaintiff had been taking venlafaxine on an irregular basis because he thought it could be used "as needed."[86]   Dr. Montgomery informed Plaintiff that venlafaxine must be taken daily to be effective and that using it as needed would result in negative side effects.[87]   She also discussed alternative medications to Plaintiff's current drug regime, which he declined.[88]

Dr. Montgomery inventoried Plaintiff's mental status, finding that his insight and judgment were limited and his affect was constricted.[89]   Dr. Montgomery noted that Plaintiff was receiving treatment for PTSD, although there is no treatment information in the record.[90]

On April 26, 2012, Plaintiff attended a primary care follow-up appointment with Archana Mahankali, M.D., ("Dr. Mahankali").[91]   At this appointment, Dr. Mahankali noted that

---

[85]     See Tr. 838.

[86]     See id.

[87]     See Tr. 840.

[88]     See id.

[89]     See id.

[90]     See Tr. 841.

[91]     See Tr. 826.

Plaintiff's depression was not well-controlled.[92]   Moreover, she stated that Plaintiff reported recurrent suicidal ideation, most recently the week prior to his appointment.[93]

After Plaintiff's August 2011 appointment with Dr. Montgomery, he did not return for a mental health examination until May 6, 2013, when he met with Philip Chii, P.A. ("Chii").[94] At this appointment, Chii noted that Plaintiff had a history of depression and anxiety.[95]   Plaintiff also reported at this appointment that he had been out of his venlafaxine for about a month but had been compliant with his other medications.[96] Plaintiff stated that his financial stressors had lessened but that he still had a lot of anger towards the military following his discharge.[97]

Nearly a year later, in April 2014, at a primary care follow-up appointment with Dr. Mahankali,, Plaintiff stated that he felt his depression was getting worse, that he felt hopeless, and that he wanted to die.[98]   Additionally, Plaintiff told Dr. Mahankali that his mental health medications had run out two

---

[92]     See Tr. 828.

[93]     See id.

[94]     See Tr. 815.

[95]     See id.

[96]     See id.

[97]     See Tr. 815-816.

[98]     See Tr. 807.

months earlier.[99]     Dr. Mahankali noted that Plaintiff's
depression was not well-controlled and was concerned that
Plaintiff had no scheduled follow-up appointments at the VA but
was receiving treatment on a walk-in basis.[100]  Because of this,
Dr. Mahankali had a mental health nurse come and speak to
Plaintiff and advise him.[101]  Finally, Dr. Mahankali added in his
physical exam that Plaintiff's psych appeared low in mood and
affect.[102]

Several days later, on April 22, 2014, Plaintiff was
reassigned to Chii, who became Plaintiff's Mental Health
Treatment Coordinator.[103]  At this appointment, Chii noted that
Plaintiff missed his last follow-up appointment in August 2013.[104]
Chii stated that Plaintiff had a history of major depressive
disorder, recurrent, anxiety, and that he had not been compliant
with his medications in the past, particularly in the last two
months when he took no action after his prescriptions lapsed.[105]
However, Chii also reported that while at the last visit
Plaintiff had requested not to be on daily medications; Plaintiff

---

[99]     See id.

[100]    See Tr. 808.

[101]    See id.

[102]    See id.

[103]    See Tr. 802.

[104]    See Tr. 803.

[105]    See id.

now felt he needed to go back on daily medications because his symptoms were worsening.[106]  Chii also wrote that Plaintiff still had a lot of anger towards his previous employer.[107]  Chii decided that he would simplify Plaintiff's medications to venlafaxine and quetiapine.[108]

## C. __Application to Social Security Administration__

Between 2007 and 2014, Plaintiff was evaluated by state agency examiners for both physical and mental impairments and he has submitted numerous functional reports, both self-evaluations and doctor evaluations, in support of his applications.  The scope of this court's opinion will primarily concentrate on Plaintiff's mental health issues, his most recent ALJ hearing in 2014, and the Commissioner's subsequent decision.

Following Plaintiff's initial application for benefits in 2007, Plaintiff's mental health was assessed by Dr. Gilliland for the state agency in November, 2007.[109]  Dr. Gilliland considered whether Plaintiff's mental health impairment met a Listing as well as Plaintiff's mental residual functional capacity ("RFC").[110]

---

[106]    See Tr. 804.

[107]    See id.

[108]    See Tr. 805.

[109]    See Tr. 399-415.

[110]    See id.

Using the Psychiatric Review Technique, Dr. Gilliland identified Plaintiff's diagnosis of major depressive disorder as a medically determinable impairment under Listing 12.04, affective disorders;[111] however, when rating his functional limitations, the "B" criteria of the Listings, Dr. Gilliland found that at most Plaintiff had: (1) mild restrictions in activities of daily living; (2) mild difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, or pace; and (4) no episodes of decompensation.[112]   Thus, Plaintiff's mental impairment did not satisfy the functional criteria of the Listing.[113]

Because Plaintiff's impairment did not meet the requirements for the "B" criteria, Dr. Gilliland evaluated Plaintiff's condition under the "C" criteria.[114]   Under the "C" criteria, Dr. Gilliland did not find that Plaintiff's mental impairment was medically documented as having lasted longer than two years,[115] therefore, Plaintiff's impairment did not meet or equal a Listing.[116]

---

[111]     See Tr. 403, 406.

[112]     See Tr. 413.

[113]     See id.

[114]     See Tr. 414.

[115]     See id.

[116]     See Tr. 403.

Considering mental RFC, Dr. Gilliland found that Plaintiff could "understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in a routine work setting."[117]   Additionally, Dr. Gilliland reported that Plaintiff had no marked limitations.[118] Therefore, Plaintiff did not meet the criteria for being disabled during the initial closed period based on his mental health, but did meet the criteria based on his history of cancer and necessary recovery time.[119]

One year later in a questionnaire dated December 4, 2008, Dr. Harper found that Plaintiff's mental impairment met the requirements for Listing 12.04.[120]   Under criteria "A", Dr. Harper found that Plaintiff suffered from a depressive syndrome, characterized by: (1) sleep disturbance; (2) decreased energy; (3) feelings of guilt or worthlessness; (4) difficulty concentrating or thinking; and (5) thoughts of suicide.[121] Under the "B" criteria, Dr. Harper's analysis showed Plaintiff had marked limitations in three categories: (1) restrictions of

---

[117]    See Tr. 400.

[118]    See Tr. 399.

[119]    See Tr. 78, 100.

[120]    See Tr. 432-36.

[121]    See Tr. 433.

activities of daily living; (2) difficulties in maintaining social functioning; and (3) difficulties in maintaining concentration, persistence, or pace.[122]

Turning to the "C" criteria, Dr. Harper found that Plaintiff met the first requirement of having a "medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support."[123] Dr. Harper also found that Plaintiff had "a residual disease process that has resulted in such marginal adjustment that has [sic] even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate," satisfying Listing 12.04.[124]

Finally, regarding Plaintiff's mental RFC, Dr. Harper found that Plaintiff would have marked difficulties in interacting appropriately with supervisors and interacting appropriately with co-workers; and extreme difficulties in: (1) understanding and remembering detailed instructions; (2) carrying out detailed instructions; (3) responding appropriately to work pressures in a usual work setting; and (4) responding appropriately to changes

---

[122]   See Tr. 434.

[123]   See Tr. 435.

[124]   See Tr. 435.

in a routine work setting.[125]  Dr. Harper's findings were based on his clinical evaluation of Plaintiff.[126]

On January 14, 2009, Dr. Graham also concluded that Plaintiff met the requirements for Listing 12.04.[127]  Similar to Dr. Harper, Dr. Graham found that Plaintiff suffered from a depressive syndrome under criteria "A", with the addition that he considered Plaintiff to also have "anhedonia or pervasive loss of interest in almost all activities."[128]  Under criteria "B", Dr. Graham found that Plaintiff had marked limitations and difficulties in maintaining social functioning and mild limitations in all other categories.[129]  Finally, under the "C" criteria, Dr. Graham made the same findings as Dr. Harper.[130]

In support of his opinion, Dr. Graham cited examples of Plaintiff's attempts to obtain employment and that none of these efforts were successful due to Plaintiff's marked difficulties with social functioning.[131]  Dr. Graham described further how Plaintiff's most recent episode of depression and irritability

---

[125]    _See_ Tr. 437.

[126]    _See_ Tr. 432.

[127]    _See_ Tr. 440.

[128]    _See_ Tr. 441.

[129]    _See_ Tr. 442.

[130]    _See_ Tr. 435, 443.

[131]    _See_ Tr. 442.

had continued unabated despite treatment; thus he did not believe Plaintiff to be malingering.[132]

For Plaintiff's mental RFC, Dr. Graham reported marked limitations in Plaintiff's ability to: (1) carry out detailed instructions; (2) interact appropriately with the public; (3) interact appropriately with supervisors; and (4) interact appropriately with co-workers.[133]  Dr. Graham also found there to be moderate limitations in Plaintiff's ability to: (1) understand and remember detailed instructions; (2) make judgements on simple work-related decisions; (3) respond appropriately to work pressures in a usual work setting; and (4) respond appropriately to changes in a routine work setting.[134]  Lastly, Dr. Graham found that Plaintiff only had slight limitations for understanding and remembering short, simple instructions and carrying out short, simple instructions.[135]  Dr. Graham's opinion in support of these findings is that his "notable irritability to supervisors, co-workers, and anyone else he interacts with at work or in work environments" caused "significantly more problems."[136]

---

[132]    See id.

[133]    See Tr. 445.

[134]    See id.

[135]    See id.

[136]    See id.

Disregarding Dr. Harper's and Dr. Graham's findings, the ALJ issued an unfavorable decision in March, 2009.[137]  Plaintiff reapplied for SS disability benefits in the fall of 2009.[138] Plaintiff underwent a physical consultative examination with Farzana Sahi, M.D., ("Dr. Sahi") and a psychological evaluation with David Edwards, Ph.D. ("Dr. Edwards").[139]  Finally, Plaintiff's medical records were again evaluated by Dr. Gilliland for the agency on April 23, 2010, to determine the extent of Plaintiff's mental impairments.[140]

At Plaintiff's consultative examination, Dr. Sahi noted that Plaintiff appeared severely depressed.[141]  Plaintiff visited Dr. Edwards for a psychological evaluation on March 20, 2010.[142]  This examination consisted of a clinical interview with a mental status examination. [143]  Plaintiff reported his chief complaint was depression.[144]  Plaintiff also reported problems with cleaning, shopping, cooking, and managing finances due his

---

[137]    See Tr. 83.

[138]    See Tr. 144, 167.

[139]    See Tr. 447, 1015.

[140]    See Tr. 765-78.

[141]    See id.

[142]    See Tr. 1015.

[143]    See id.

[144]    See Tr. 1016.

depression symptoms.[145]   Regarding social functioning, Plaintiff related to Dr. Edwards that he did not have friends with whom he would visit or who would visit him, but that he got along with family members.[146]   Plaintiff identified a decreased ability in the areas of persistence and pace of task completion.[147]

Dr. Edwards found during his status examination that Plaintiff's affect was of decreased range and intensity and that the wide range of Plaintiff's concerns suggested a general anxiety disorder.[148]   Dr. Edwards also found that Plaintiff's recent and remote memory appeared to be "below average," as did his attention and concentration.[149]   Plaintiff described an "ongoing concern that he is watched and followed" and admitted that in the past he had seen "shadows".[150]   Finally, Dr. Edwards noted that Plaintiff engaged in withdrawal and avoidance behaviors.[151]

Following his examination, Dr. Edwards reported the following diagnostic impressions: (1) major depressive disorder, severe with indication of delusional symptoms present on

---

[145]   See id.

[146]   See id.

[147]   See Tr. 1017.

[148]   See Tr. 1018.

[149]   See id.

[150]   See id.

[151]   See Tr. 1019.

interview; (2) social phobia; (3) PTSD, chronic, without delay of systems; and (4) panic disorder with some indications of agoraphobia.[152]  Other diagnostic impressions included a GAF score of 40 and "severe problems in the areas of impairment at work, communication with others, judgement difficulties and significant problems with mood and anxiety."[153]  It was Dr. Edwards' opinion that Plaintiff's prognosis was poor, that he has marked difficulties in the areas of social functioning, task completion and some difficulties in the area of activities of daily living as well as that "he would have difficulty sustaining employment at this time."[154]

Following Plaintiff's most recent examination and the submission of other application materials, Dr. Gilliland again evaluated Plaintiff's file and medical records to determine if he met the criteria for disabled status at any point from March 18, 2009, to April 2, 2010.[155]  Dr. Gilliland evaluated Plaintiff under both 12.04, affective disorders, and 12.06, anxiety-related disorders.[156]  Dr. Gilliland also agreed with the diagnosis that

---

[152]   See id.

[153]   See id.

[154]   See id.

[155]   See Tr. 765.

[156]   See id.

Plaintiff suffered from chronic PTSD and a panic disorder with agoraphobia.[157]

Under criteria "B", Dr. Gilliland found that, Plaintiff suffered from moderate difficulties in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace.[158]  Thus, Plaintiff did not meet the requirement for criteria "B".[159]

Under criteria "C", Dr. Gilliland concurred with Dr. Harper's and Dr. Graham's previous assessments that Plaintiff met this criteria.[160]  Dr. Gilliland also noted that he found the alleged limitations should be treated as credible based on the VA records, Dr. Sahi's report, and Dr. Edwards' report.[161]  Because Dr. Gilliland found that Plaintiff met a Listing, he did not proceed with an RFC assessment.[162]

Following Dr. Gilliland's evaluation, Plaintiff was informed he was eligible for benefits upon a finding that he was disabled, and received an award letter in May 2010.[163]  However, by the beginning of 2011, the Appeals Council had vacated the ALJ's

---

[157]   See Tr. 770.

[158]   See Tr. 775.

[159]   See id.

[160]   See Tr. 776.

[161]   See Tr. 777.

[162]   See Tr. 765-78.

[163]   See Tr. 121.

unfavorable decision, re-opened the favorable decision, consolidated Plaintiff's claims, and remanded them to an ALJ in order to determine why there was inconsistency in the determination of his disability status.[164]

Following the Appeals Council decision, Plaintiff underwent another internal medicine consultative examination and psychological evaluation in order to submit more recent evidence to assist the ALJ in determining Plaintiff's disability status.

On April 25, 2014, Plaintiff saw Hanna Abu-Nassar, M.D., ("Dr. Abu-Nassar") for an internal medicine examination.[165]   At this appointment, Dr. Abu-Nassar reviewed Plaintiff's medical records from August 18, 2005, through February 16, 2010.[166] Following the review of Plaintiff's file and examination of Plaintiff, it was Dr. Abu-Nassar's clinical impression that Plaintiff had a history of throat cancer with no recurrence and associated major depressive disorder and chronic fatigue syndrome.[167]

Plaintiff then saw Psychologist Merrill Anderson, Ph.D., ("Dr. Anderson") for an evaluation on April 29, 2014.[168]   At this

---

[164]    See Tr. 118-20.

[165]    See Tr. 779-92.

[166]    See id.

[167]    See Tr. 783.

[168]    See Tr. 793.

appointment, Plaintiff complained of depression, affective mood disorder, and anxiety disorder.[169]   On Plaintiff's mental status examination, Dr. Anderson found that Plaintiff's depressive symptoms included "long term and recently aggravated anger/irritability," reduced motivation, and sleep issues.[170]   Dr. Anderson also noted that Plaintiff reported increased interpersonal distrust and long-term defensiveness as well as anxiety symptoms.[171]   Additionally, it was found that Plaintiff's anxiety symptoms appeared to be mostly associated with his anger.[172]   Finally, the report confirmed signs of mild psychomotor retardation and tears.[173]

Dr. Anderson administered several clinical tests on Plaintiff.[174]   Based on these evaluations, Dr. Anderson reported that Plaintiff's "level of effort and engagement was variable, with impression of fatigue and of inconsistent focus."[175]   After considering the mental status examination and various tests, Dr. Anderson, like Dr. Harper, diagnosed Plaintiff with a cognitive

---

[169]   See id.

[170]   See Tr. 794.

[171]   See id.

[172]   See id.

[173]   See id.

[174]   See Tr. 795-96.

[175]   See Tr. 796.

disorder and major depression, recurrent, severe.[176]  He also assessed Plaintiff's GAF score at 55.[177]  It was Dr. Anderson's opinion that Plaintiff's prognosis was "fair," but he gave no further explanation regarding Plaintiff's prognosis.[178]

Dr. Anderson completed a "Medical Source Statement of Ability to do Work-Related Activities (Mental)."[179]  Dr. Anderson reported that he believed Plaintiff had no limitations in his abilities to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions.[180]  Dr. Anderson found that Plaintiff would have moderate limitations in his abilities to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions.[181]  It was his opinion that Plaintiff would have moderate limitations in his ability to interact appropriately with the public and interact appropriately with coworkers.[182]  Finally, Dr. Anderson reported Plaintiff would have marked limitations interacting appropriately

---

[176]    See id.

[177]    See id.

[178]    See Tr. 797.

[179]    See Tr. 798.

[180]    See Tr. 798.

[181]    See id.

[182]    See Tr. 799.

with supervisors as well as responding appropriately to usual work situations and to changes in a routine work setting.[183]

Finally, in anticipation of the second hearing, Plaintiff submitted an updated self-assessment function report in July 2014.[184]   On this report, Plaintiff addressed his problems with anger in the form of a narrative.[185]   He discussed how he had always had problems with physical confrontations, dating back to childhood, and gave examples of fights he had in school, in the military, and with co-workers and supervisors.[186]   Plaintiff also described how, after his cancer diagnosis and discharge from the military, his anger became more "intense and violent."[187]

With the record updated accordingly, the ALJ then set a new hearing for July 30, 2014.[188]

**D. Hearing**

Plaintiff, his wife, two medical experts and a vocational expert ("VE") gave testimony at the hearing.[189]   At the beginning of the hearing, the ALJ incorrectly stated that the claims had been consolidated because the Appeals Council questioned the 2009

---

[183]   See id.

[184]   See Tr. 963.

[185]   See Tr. 972-75.

[186]   See id.

[187]   See id.

[188]   See Tr. 126.

[189]   See Tr. 1087.

administrative decision and sustained the ALJ's prior denial in March 2009, thus remanding the claims to him.[190] Plaintiff's attorney responded that the Appeals Council had in fact vacated both the ALJ's denial and the subsequent decision due to inconsistency.[191]

Plaintiff testified that he was thirty-nine years old, married, had four children, and lived with his wife and two youngest children.[192] Plaintiff graduated high school, and last worked in 2007.[193] Plaintiff testified that he was being treated for anger, depression, and anxiety, for which he first started treatment in 2007.[194] Plaintiff explained that he was compliant with his medications but occasionally ran out due to difficulties coordinating with the VA to get refills; he also opined that his medications did not help him much.[195]

Plaintiff described his daily routine: on an average day, he would take his two boys to and from school and during the day, he would do "basically just nothing."[196] Plaintiff explained that he did nothing because his medications made him tired, causing him

---

[190]    See Tr. 1088.

[191]    See Tr. 1089-90.

[192]    See Tr. 1092-93.

[193]    See Tr. 1093-94.

[194]    See Tr. 1097-98.

[195]    See Tr. 1099-1101.

[196]    See Tr. 1103.

to sit and become overwhelmed with anxiety by things that he needed to do.[197]   Plaintiff also complained that anxiety affected his sleep.[198]

Plaintiff testified that he did not have hobbies, but that his family recently took a trip to Pensacola, Florida.[199] Plaintiff stated that his wife drove and that he did not leave the hotel.[200]   Plaintiff further testified that he thought constantly about the way the military discharged him and the effects his discharge had on him and his family.[201]   Plaintiff explained he had a twenty-one month break between mental health appointments at the VA because Dr. Graham left and that he was being consistently moved to doctors who did not know him.[202]

Plaintiff described how he typically did not go anywhere without his wife, stating she "makes sure I, I don't get into it with anybody" and that he's "always ready for confrontation."[203] Finally, Plaintiff testified that he felt he had the ability to

---

[197]   See Tr. 1108-09.

[198]   See Tr. 1104-05.

[199]   See Tr. 1109-11.

[200]   See Tr. 1110-12.

[201]   See Tr. 1113-15.

[202]   See Tr. 1124.

[203]   See Tr. 1127-28.

31

"tune in to the spiritual side," and that he heard "things from the spiritual world."[204]

Next to testify was Albert Oguejiofor, M.D., ("Dr. Oguejiofor") a medical expert, who reviewed the non-mental aspects of Plaintiff's medical record.[205]  Dr. Oguejiofor explained to the ALJ that based on his review of Plaintiff's medical records, he did not find that Plaintiff met any of the requirements for a Listing.[206]  Dr. Oguejiofor described Plaintiff's functional ability as medium, based solely on physical abilities.[207]

The second medical expert, Ashok Khushalani, M.D., ("Dr. Khoushalani") testified regarding Plaintiff's mental health.[208] After reviewing Plaintiff's mental health records, Dr. Khushalani found that Plaintiff's mental health issues responded well to treatment; and thus, Plaintiff did not meet the criteria for Listing 12.04.[209]  Furthermore, Dr. Khushalani considered the "B" criteria of Listing 12.04 and stated that Plaintiff's mental impairment caused mild limitations on his activities of daily living and maintaining concentration, persistence, and pace;

---

[204]   See Tr. 1128.

[205]   See Tr. 1129.

[206]   See Tr. 1130-31.

[207]   See Tr. 1133.

[208]   See Tr. 1134.

[209]   See Tr. 1134-35.

moderate limitations on his social functioning; and Plaintiff had no episodes of decompensation.[210]   Beyond his criteria "B" findings for Listing 12.04, Dr. Khushalani did not elaborate further on Plaintiff's mental RFC.[211]

Prompted by Plaintiff's attorney, Dr. Khushalani confirmed that Dr. Harper's assessment of Plaintiff's GAF score was not necessarily inconsistent with the higher GAF scores given by Dr. Graham at the VA because the scores were dependent upon how the individual appears on that day.[212]   Finally, Dr. Khushalani stated that Dr. Anderson's scoring of Plaintiff's GAF could still be consistent with his designation of Plaintiff's having marked limitations with interacting with supervisors as well as responding appropriately to usual work situations and to changes in a routine work setting.[213]

Plaintiff's wife was asked if she thought it would be hard for Plaintiff to work, and responded: "he has a habit of getting confused; and when confusion comes, then the frustration and the anger kick in; and, he just shuts down completely."[214]   Mrs. Franco also testified that Plaintiff had confided in her that he

---

[210]   See Tr. 1135.

[211]   See Tr. 1134-35.

[212]   See Tr. 1135-40.

[213]   See Tr. 1144-46.

[214]   See Tr. 1151.

heard voices and saw things since at least February 2007, and that it scared her.[215]

She also testified that Plaintiff had been compliant with taking his medications, with the only exception being when the prescription ran out.[216]  Lastly, Plaintiff's wife testified that when they were in Pensacola, Plaintiff never left the hotel area and primarily stayed on the balcony.[217]  She also stated that they had been to Disney World twice, once in 2010 and again before they went to Pensacola.[218]

The VE then testified.  The ALJ described two hypothetical individuals;[219] someone capable of physical exertions set at medium; occasional exposure to heat, humidity, and dangerous machinery, with a high school education.[220]  In the second hypothetical, the ALJ described a hypothetical individual who got along with others, understood simple instructions, concentrated, performed simple tasks, responded and adapted to workplace changes and supervision; but, was limited to an occasional public-employee contact setting.[221]  The ALJ then asked if either

---

[215]    See Tr. 1152-53.

[216]    See Tr. 1153.

[217]    See Tr. 1153-54.

[218]    See Tr. 1154-55.

[219]    See Tr. 1172-73.

[220]    See Tr. 1172.

[221]    See id.

of the hypothetical persons could engage in any of Plaintiff's past work.[222]  The VE responded that such an individual could not do any of Plaintiff's past work; however, the VE found that with those limitations, the hypothetical persons would be capable of finding unskilled work as an industrial cleaner, stock clerk, or a hand packager.[223]

The ALJ then asked what kind of jobs would be available for the same hypothetical person, except with a decreased physical exertional level.[224]  The VE responded that he could find work at the light exertional level as an office cleaner, a clothing sorter, or a small products assembler.[225]

Next, Plaintiff's attorney posed three hypothetical individuals to the VE.[226]  He set the physical RFC at sedentary for all three hypotheticals and based the mental RFC on the limitations found by Doctors Harper, Graham and Anderson.[227]  The first mental RFC of the hypothetical individual was described as someone who has moderate limitations in understanding and remembering short, simple instructions; moderate limitations in carrying out short, simple instructions; extreme limitations

---

[222]   See id.

[223]   See Tr. 1172-73.

[224]   See Tr. 1173.

[225]   See Tr.1173-74.

[226]   See Tr. 1174.

[227]   See Tr. 1174-80.

understanding and remembering detailed instructions; extreme limitations carrying out detailed instructions; moderate limitations in the ability to make judgments and simple work-related decisions; moderate limitations in interacting appropriately with the public; marked limitations in interacting appropriately with supervisors; marked limitations in interacting appropriately with coworkers; extreme limitations in responding appropriately to work pressures in a usual work setting; and extreme limitations in responding appropriately to changes in a routine work setting.[228]  The VE found that there would be no jobs for such an individual.[229]

    Next, Plaintiff's attorney asked the VE if a hypothetical individual with slight limitations on understanding and remembering short, simple instructions; slight limitations on carrying out short, simple instructions; moderate limitations understanding and remembering detailed instructions; marked limitations carrying out detailed instructions; moderate limitations in the ability to make judgments and simple work-related decisions; marked limitations in interacting appropriately with the public; marked limitations in interacting appropriately with supervisors; marked limitations in interacting appropriately with coworkers; moderate limitations in responding

---

[228]    See Tr. 1175-76.

[229]    See Tr. 1176.

appropriately to work pressures in a usual work setting; and moderate limitations in responding appropriately to changes in a routine work setting would be able to find a job.[230]   The VE responded that initially this person could obtain work but that they would not be able to sustain work over any significant period of time.[231]

The last and final hypothetical Plaintiff's attorney posed to the VE was whether someone at the sedentary exertional level and with no limitations in understanding and remembering simple instructions; no limitations carrying out simple instructions; no limitations with the ability to make judgments and work-related decisions; moderate limitations understanding and remembering complex instructions; moderate limitations carrying out complex instructions; moderate limitations in the ability to make judgments on complex work-related decisions; moderate limitations in interacting appropriately with the public; marked limitations with interacting appropriately with supervisors; moderate limitations in interacting with coworkers appropriately; and marked limitations in responding appropriately to usual work situations and to changes in a routine work setting would be able to find a job.[232]

---

[230]   <u>See</u> Tr. 1176.

[231]   <u>See</u> Tr. 1177.

[232]   <u>See</u> Tr. 1178.

Similar to the individual in hypothetical two, the VE testified that someone with this profile would be able to obtain a job, and may even be able to keep it longer than the person in hypothetical two; however, that this person would not be able to maintain the same job over a significant period of time.[233]

### E. Commissioner's Decision

The ALJ issued an unfavorable decision on September 25, 2014.[234] The ALJ found that Plaintiff had two severe impairments, a history of tonsil cancer with radiation treatment and depression.[235] The ALJ determined that neither of Plaintiff's severe impairments, individually or as a combination, met or medically equaled a Listing, and that Plaintiff had the RFC to perform less than the full range of medium work with some additional limitations.[236] Thus, the ALJ concluded there existed jobs in the national economy that Plaintiff could perform, and Plaintiff was found not disabled.[237]

Under the Listings, the ALJ first evaluated Plaintiff's physical impairments.[238] The ALJ rejected the VA's evaluation of Plaintiff as suffering from chronic fatigue syndrome because

---

[233]    See Tr. 1179.

[234]    See Tr. 15.

[235]    See Tr. 25

[236]    See Tr. 62, 67.

[237]    See Tr. 75-76.

[238]    See Tr. 62.

Plaintiff's medical record did not show any evidence of treatment for chronic fatigue syndrome.[239]   Thus, the ALJ did not consider Plaintiff's complaint of chronic fatigue syndrome in his analysis for whether Plaintiff's impairments met a Listing.[240]   Next, the ALJ found that Plaintiff's cancer had been in remission without metastases so it did not meet the requirements for a Listing.[241] Additionally, the ALJ did not find that Plaintiff's radiation treatment caused any impairments.[242]

When deciding Plaintiff's physical RFC, the ALJ gave great weight to the ME's opinion that Plaintiff could perform the demands of medium exertional work, with no non-exertional limitations.[243]   However, the ALJ did assign some physical non-exertional limitations to Plaintiff in order to remain consistent with his previous findings at the 2009 hearing.[244]   The ALJ gave little weight to Dr. Abu-Nassar's opinion, who would have limited Plaintiff to less than sedentary work.[245]

---

[239]    See Tr. 26.

[240]    See Tr. 26.

[241]    See Tr. 62.

[242]    See Tr. 62-63.

[243]    See 68.

[244]    See id.

[245]    See Tr. 69.

Considering the record, the ALJ did not find Plaintiff's mental health impairments to meet Listings 12.04 or 12.06.[246] As outlined above, these two Listings required the mental impairment to meet the "A" criteria as well as either the "B" criteria, "C" criteria, or both.[247] The ALJ failed to discuss the "A" criteria because he did not find that Plaintiff's mental impairments could meet the requirements for either the "B" or "C" criteria.[248]

To meet the "B" criteria, Plaintiff must have at least two marked limitations or one marked limitation and "repeated" episodes of decompensation, each of extended duration.[249] The ALJ found that Plaintiff only had mild or moderate limitations and at most one or two episodes of decompensation, each of extended duration.[250]

Generally, to meet the "C" criteria, Plaintiff had to be receiving treatment that eases his symptoms caused by the impairment, but does not eliminate them.[251] The ALJ relied on Dr. Khushalani's testimony at Plaintiff's hearing that none of the

---

[246]   See Tr. 63.

[247]   See Tr. 403, 406, 413-14.

[248]   See id.

[249]   See Tr. 64.

[250]   See Tr. 63-64.

[251]   See Tr. 66.

"C" criteria were met and the ALJ generally credited this opinion.[252]

The ALJ summarized Doctors Harper, Gilliland, and Graham's opinions that Plaintiff's mental health impairment met the requirements for Listing 12.04.[253]   Dr. Harper found that Plaintiff met the criteria for "A", "B", and "C" while Doctors Gilliland and Graham found that Plaintiff met the Listing on the basis of "A" and "C" criteria.[254]

However, the ALJ stated that he did not credit any medical opinions that would find Plaintiff disabled because he did "not consider the [sic] are supported by the contemporaneously generated medical evidence in the file."[255]   The ALJ indicated that Dr. Graham's opinion, as Plaintiff's treating physician, was entitled to "significant deference," however, the ALJ noted a "striking pattern" in Dr. Graham's reports: that his mental status examinations were normal or mostly normal, thus he would not credit his opinion for finding Plaintiff disabled.[256]

The ALJ found that Plaintiff's mental RFC was as follows: that he can "get along with others; understand simple

---

[252]   See Tr. 64.

[253]   See Tr. 65-66.

[254]   See id.

[255]   See Tr. 66.

[256]   See id.

instructions; concentrate and perform simple tasks; respond and adapt to work-place changes and supervisions, but limited to an occasional public-employee contact setting."[257]

When determining Plaintiff's mental RFC, the ALJ gave little weight to the opinions of any of the mental health doctors' assessments of Plaintiff's mental RFC for the same reason he did not give them credit with regards their finding that Plaintiff was disabled.[258]   The ALJ stated that he partially credited Dr. Graham's opinions, but disregarded any assessment of Plaintiff's mental RFC that was more limiting than Dr. Graham's.[259]   The ALJ stated Dr. Graham's opinion established a "floor– not the ceiling" with regards to Plaintiff's mental RFC.[260]

For this reason, the ALJ also did not consider the Plaintiff as having a cognitive disorder, panic disorder, or PTSD; stating "I will follow Dr. Graham's diagnoses."[261]

The ALJ discounted the Plaintiff's and Plaintiff's wife's testimony at the hearing.[262]   He found that if Plaintiff traveled on two vacations to Florida with his family, that his and his wife's reports regarding the extent of the limitations his

---

[257]   See Tr. 68.

[258]   See Tr. 70.

[259]   See id.

[260]   See id.

[261]   See Tr. 27–28.

[262]   See Tr. 53–57.

depression imposed on his social functioning were not consistent with his ability to go on these trips.[263]

Additionally, the ALJ was not convinced that Plaintiff's anger and behavioral issues were causally connected to Plaintiff's depression due to Plaintiff's testimony about his history of confrontational behavior, dating back to childhood.[264] In his analysis, the ALJ stated, that "from the claimant's own narrative it is difficult to conclude that the claimant's mental impairments have had any effect on his anger, or his behavior pattern."[265]

The ALJ relied on Dr. Harper's medical testing only to the extent that it showed that Plaintiff "might be subjectively exaggerating his symptoms," and that Dr. Harper's failure to diagnose Plaintiff with a personality disorder supported the ALJ's conclusion that Plaintiff's depression did not cause his behavior.[266]

As a result, the ALJ decided that Plaintiff's mental impairment did not "have any causal relationship to his behavior and anger" and did not factor this limitation when determining

---

[263]   See id.

[264]   See Tr. 71-72.

[265]   See id.

[266]   See Tr. 73.

Plaintiff's mental RFC.[267]   However, the ALJ did determine that Plaintiff's anhedonia and isolation were a result of his depression.[268]

After establishing Plaintiff's RFC, the ALJ found in the final steps of his analysis that while Plaintiff would not be able to perform any of his past relevant work, there existed in the regional and national economy significant numbers of jobs he could perform.[269]   These included an industrial cleaner, stock clerk, office cleaner, or small products sorter.[270]   For these findings, the ALJ relied on the VE's testimony given at the hearing where he described the types of jobs available to a hypothetical individual with the limitations posed by the ALJ.[271] Thus, the ALJ concluded that Plaintiff had not been under a disability since the end of the initial closed period in 2007 through the date of his current decision.[272]

Plaintiff filed a request for review of the ALJ's unfavorable decision.[273]   After the Appeals Council denied

---

[267]     See id.

[268]     See id.

[269]     See Tr. 75.

[270]     See id.

[271]     See id.

[272]     See Tr. 76.

[273]     See Tr. 12-14.

Plaintiff's request for review on June 18, 2015,[274] Plaintiff timely filed this action for judicial review of the decision in this court.[275]

## II. Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A. Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving that he is disabled within the meaning of the Act.  Wren v. Sullivan, 952 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if he is unable "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and

---

[274]    See Tr. 7.

[275]    See Doc. 1, Pl.'s Compl.

laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to[a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 416.920.  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

## B. **Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance." Id.  The Commissioner

has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. 42 U.S.C. § 405(g); Selders v. Sullivan, 914, F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  Johnson v. Bowen, 864 F.2d. 340, 343-44 (5th Cir. 1998).  In applying this standard, the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.  Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to deer to the decision of the Commissioner as much as possible without making its review meaningless.  Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff asserts the ALJ's decision contains the following errors: (1) Defendant's decision is not supported by substantial evidence, (2) Defendant failed to evaluate and consider movant's cognitive disorder, and (3) Defendant failed to fully evaluate and accord great weight to the VA's finding that Plaintiff is 100% disabled. Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

**A.   Plaintiff's Mental RFC**

Plaintiff argues that the ALJ's decision is not supported by substantial evidence, specifically the ALJ's finding that Plaintiff does not suffer from significant non-exertional impairments.   Defendant responds that there is substantial evidence in the record to support the ALJ's findings.

ALJs are ultimately responsible for determining a claimant's RFC.   See McCuller v. Barnhart, 72 F. App'x 155, 160 (5th Cir. 2003); 20 C.F.R. § 404.1546.   In addition, an ALJ is meant to consider medical evidence along with any observations regarding limitations submitted by the claimant or the claimant's family, friends, neighbors, or other persons to aide in his determination.   20 C.F.R. 404.1545(a)(3).   However, if the ALJ has found a severe impairment, the ALJ is required to consider the limiting effects of all of a claimant's impairments when determining an RFC, whether or not these are considered severe. 20 C.F.R. 404.1545(e).

Although it is the responsibility of the ALJ to make RFC determinations, the Fifth Circuit has ruled that ALJs should not make medical judgements regarding a claimant's ability to work where such interpretation is not supported by clinical findings. Loza v. Apfel, 219 F.3d 378, 395 (5th Cir. 2000).   Additionally, "an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions."

48

<u>Williams v. Astrue</u>, 355 F. App'x 828, 832 n.6 (5th Cir. 2009).
Moreover, in <u>Frank v. Barnhart</u>, the Fifth Circuit appeared to
adopt the warning from the Seventh Circuit:

> But judges, including administrative law judges of the
> Social Security Administration, must be careful not to
> succumb to the temptation to play doctor.... The
> medical expertise of the Social Security Administration
> is reflected in regulations; it is not the birthright
> of the lawyers who apply them. Common sense can
> mislead; lay intuitions about medical phenomena are
> often wrong.

326 F.3d 618, 622 (5th Cir. 2003) (quoting <u>Schmidt v. Sullivan</u>,
914 F.2d 117, 118 (7th Cir. 1990)).

**1. The ALJ Erred in Not Considering Plaintiff's Anger Issues
in Determining the RFC.**

In the case before the court, the ALJ described Plaintiff's
mental RFC as follows: that he can "get along with others;
understand simple instructions; concentrate and perform simple
tasks; respond and adapt to work-place changes and supervision,
but in an occasional public-employee contact setting." The ALJ
reasoned that his finding that Plaintiff was able to get along
with others as well as respond and adapt to work-place
supervision was appropriate because he determined that
Plaintiff's reported anger and irritability issues were not
connected to his depression. Therefore, the ALJ did not factor
this limitation into Plaintiff's mental RFC, but instead
considered the Plaintiff's anhedonia and isolation as the only

legitimate symptoms to apply when determining Plaintiff's ability to work.

From the record, the ALJ cited Plaintiff's narrative testimony discussing his history since childhood regarding his tendency to be involved in confrontational behavior. He concluded that Plaintiff has always had similar behavior and his depression should therefore not be considered as a symptom. Substantial evidence from the record does not support this conclusion.

As stated in <u>Loza</u>, any determinations regarding a Plaintiff's ability to work must be based on clinical findings. 219 F.3d at 395. There is nothing in Plaintiff's mental health records that supports the ALJ's determination that Plaintiff's level of anger is not connected to his depression. In fact, the opposite is true. In reviewing the record, specifically Dr. Graham's progress notes, it is clear that the more Plaintiff struggled with his depression, the more he struggled to control his anger. Dr. Graham notes that Plaintiff's level of aggression towards his wife escalated as his depression worsened. The fact that this occurred when Plaintiff's depression worsened is evidenced by Dr. Graham's reporting of lower GAF scores during these periods.

Additionally, Dr. Graham continuously prescribed medication for Plaintiff to help with his moods, particularly his anger, as

well as his referral to Dr. Harper, citing Plaintiff's aggression and outbursts as the primary reason.

Furthermore, in evaluating Plaintiff's functional capabilities, Dr. Graham based his decision to rate Plaintiff as having marked limitations in social functioning and interacting appropriately with supervisors, coworkers and the public on his own observations of Plaintiff over an extended period of time. He specifically determined that despite ongoing treatment, Plaintiff's depression continued and his issues with irritability and other depressive symptoms rendered Plaintiff unable to maintain employment, despite several attempts.

Dr. Harper also clearly explained the connection between Plaintiff's depression and irritability. Dr. Harper stated that Plaintiff's hostility and feelings of rejection exacerbated his feelings of isolation, which was a symptom that the ALJ conceded was affected by Plaintiff's depression. It is clear that Plaintiff's feelings of alienation and anger are connected and that both of these emotions affect his mental state and continued depressive episodes.

There is no evidence in the record to indicate that any of the mental health professionals who evaluated Plaintiff's depression suspected that his anger issues were not credible. In deciding not to consider a connection between Plaintiff's anger as a symptom of his depression, the ALJ is effectively 'playing

doctor' and making a medical determination, something he is not qualified to do. See Loza, 219 F.3d at 395. It appears that the ALJ supports his finding that Plaintiff's anger and depression are not causally connected to one another solely based on Plaintiff's testimony about his Florida vacations and having anger issues since childhood. However, this testimony on its own does not constitute substantial evidence in order to make this medical determination.

Furthermore, it is well established that ALJs are not to engage in picking and choosing medical evidence in order to support a position. Loza, 219 F.3d at 393. Here, the ALJ used Dr. Graham's mental status examinations and diagnosis to support his position that Plaintiff's depression was not severe and other doctors, including Dr. Graham, who used other evidence to find Plaintiff's depression severe should not be credited. This is inconsistent with the other evidence in the record that describes Plaintiff's severe mental issues, including Dr. Graham's own assessments.

Moreover, SSA procedures require all impairments, whether considered severe or not, to be considered in evaluating a claimant's RFC when an ALJ makes a finding of a severe impairment. 20 C.F.R. 404.1545(e). In Loza, the court held that the ALJ erred by not considering the combined effects of all of the plaintiff's mental and physical impairments on his ability to

engage in employment. Id. at 399. This is instructive for this instant case. As in Loza, even if there were substantial evidence to show there was not a connection between Plaintiff's depression and his anger issues, the ALJ would still need to address that Plaintiff had well documented aggression and irritability impairments. Thus, the ALJ was required to factor Plaintiff's anger issues, which he conceded existed, into Plaintiff's ability to sustain employment. There is simply no substantial record evidence to support the ALJ's finding that Plaintiff "can get along with others."

It is remarkable that three examining mental health professionals found Plaintiff had marked limitations in his capacity to interact appropriately with supervisors. Dr. Graham, in his rationale for his mental RFC assessment, noted that Plaintiff's irritability towards supervisors, co-workers and everyone else had caused significant problems. Additionally, two of these physicians also found that Plaintiff had marked or extreme limitations in his ability to respond appropriately to work-place situations and changes in routine.

To the extent that the ALJ gave less than full weight to each treating physician, it appears that he relied purely on his own conclusions to establish Plaintiff's mental RFC. The ALJ ignored doctor findings and cited Plaintiff's family trips as evidence that claimant did not have more than moderate

difficulties in social functioning. Ignoring testimony that Plaintiff remained in his hotel room and avoided interaction, the ALJ relied on Plaintiff's wife's testimony that Plaintiff traveled to Pensacola in support of his finding that Plaintiff would have only moderate difficulties interacting with others in a work setting. There is simply no substantial evidence to support the ALJ's determination and final RFC.

**2. The ALJ Erred in Failing to Give Proper Weight to the Treating Physician's Opinions.**

A treating physician should be given controlling weight if their opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and not contrary to other substantial evidence in the record. See Newton v. Apfel, 209 F.3d 448, 455. 20 C.F.R. § 404.1527(2). However, the ALJ can reject the opinion of any physician if the substantial evidence supports the opposite conclusion. See Id. at 456.

Additionally, it is well established in the Fifth Circuit that an ALJ is required to consider each of the § 404.1527(d) factors before deciding not to give controlling weight to the treating specialist. See id. at 456. These factors are: (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence; (5) the consistency of

54

the opinion with the record; and (6) the specialization of the treating physician.   See Id.; 20 C.F.R. § 404.1527(d)(2). However, an ALJ can place less reliance on a treating physician's opinion by showing good cause, which is considered: "disregarding statements [by the treating physician] that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by evidence." Leggett v. Chater, 67 F.3d 558, 566 (5th Cir. 1995).

The ALJ asserted that Dr. Graham's opinion should be given significant deference, however, he found that Dr. Graham's opinions were not supported by the medical evidence.  The ALJ in this case failed to go through each of the six factors when deciding not to give Dr. Graham controlling weight. Additionally, several other doctors agreed with Dr. Graham's assessments.  The ALJ therefore erred by failing to grant Dr. Graham's opinion controlling weight.

## B.  Plaintiff's Cognitive Disorder

Plaintiff additionally argues that the ALJ erred by failing to consider Plaintiff's cognitive disorder at Step Two in his analysis.  In his decision, the ALJ rejected Dr. Harper's and Dr. Anderson's diagnosis of a cognitive disorder.

In addition to holding that ALJs are not to make medical determinations without the support of clinical findings, Loza held that a finding that a condition existed was presumed true so

long as evidence has been presented which supports this finding and there was no proof to the contrary.  See Loza, 219 F.3d at 395-396.

Here, it is clear both doctors based their findings on clinical tests.  The ALJ rejects the doctors' findings on the basis that he would not consider any diagnosis not made by Dr. Graham, although Dr. Graham referred Plaintiff to Dr. Harper and never contradicted his findings.  Additionally, there was no substantial evidence from the record that would contradict Dr. Harper's or Dr. Anderson's finding of a cognitive disorder. Therefore, the ALJ erred by not considering Plaintiff's cognitive disorder.  See also Knox v. Astrue, 660 F. Supp. 2d 790, 814 (S.D. Tex. 2009) (holding test results that showed a plaintiff had low cognitive ability could not be discounted without substantial evidence to the contrary).

Moreover, there is further evidence of the ALJ's engaging in inappropriate picking and choosing of medical evidence.  Although he did not credit Dr. Harper's clinical tests in support of his diagnosis, the ALJ observed that Dr. Harper made the finding that Plaintiff may be exaggerating his symptoms during a clinical test due to emotional decompensation caused by his anger.  The ALJ improperly mischaracterized Dr. Harper's finding as an acknowledgment of Plaintiff's malingering in order to discredit

Plaintiff's testimony, even when he rejected Dr. Harper's other clinical findings.  This is error.

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **GRANTED** and Defendant's motion be **DENIED** and that this matter be **REMANDED** to the Commissioner for further consideration in light of this Memorandum and Recommendation.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.  Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 12th day of July, 2016.

_____
U.S. MAGISTRATE JUDGE